THERIOT, J.
| gDefendants-appellants, City of Baton Rouge and Baton Rouge Pohce Department Officer Carl Alexander, appeal the trial court’s judgment awarding damages to plaintiff-appellee, Cedric Batiste, for personal injuries Batiste sustained when Alexander allegedly falsely arrested him. For the following reasons, we reverse and render judgment in favor of the City of Baton Rouge and Officer Carl Alexander.
FACTUAL AND PROCEDURAL BACKGROUND
On February 23, 2010, Alexander was assigned extra duty as a uniformed pohce officer at Capital Area Human Services, which deals with mental health patients, among others. He received a policy and procedures manual, but was given no additional training. When visitors entered the building, they had to sign the logbook. If a visitor was going upstairs to see someone, the officer on duty checked identification after the visitor signed in and gave the visitor a pass. The officer would contact those upstairs to advise them they had a visitor. However, if the visitor was going to the mental health facility, the person had to go to the left, walk to a desk, and sign in with the clerk. Batiste, who testified he had been diagnosed as mildly retarded, schizophrenic, and bipolar in 1992, and who was forty years old on the date of the incident, was bringing documentation to Carla Lewis for his son who had a contract with Capital Area Human Services for assistance.[1]
According to Alexander, Batiste walked in and proceeded upstairs. Alexander told him he needed to sign the logbook. Batiste replied that he was bringing a letter for his son. Alexander again told Batiste that he could not go upstairs until he signed in and received a visitor’s pass. Alexander testified that Batiste would not sign in and | ¡¡became loud and belligerent and cursed. Alexander asked Batiste to step outside, which he did.
*194 Contrary to Alexander’s trial testimony, Batiste testified he walked in the building, put his phone, wallet, and keys in the basket, went through the metal detector, and then began signing the logbook. Batiste testified that Alexander asked him what he was doing and he replied that he was signing his name. According to Batiste, once a visitor signed his name in the logbook, he was given a number and could go upstairs without having to show identification. Batiste stated that Alexander then asked him to step outside. He denied raising his voice inside the building.
Each party’s testimony as to the ensuing events continues to differ, but Alexander ultimately arrested Batiste, handcuffed him, and put him in a police car. He issued Batiste a summons for disturbing the peace, remaining on the premises after being forbidden, and resisting arrest. On February 9, 2011, Batiste filed suit against the City and Alexander.[2] He sought damages for personal injuries he alleged he sustained due to a false arrest by Alexander who was in the course and scope of employment with the City. The parties stipulated that the total amount of damages did not exceed $50,000.00 and the matter would proceed as a bench trial.
After the bench trial, the trial court signed a judgment granting Batiste’s claims against the City and Alexander and awarding him $30,000.00 in damages, together with legal interest from the date of judicial demand and costs. The trial court did not provide reasons for judgment. From this judgment, the City and Alexander appeal. On appeal, defendants contend the trial court erred in crediting the “self-serving, incredible testimony of the plaintiff over the reasonable, consistent account provided by the defendant and the two independent eye-witnesses.” They also contend that the damages award is excessive and unsupported.

\/Trial Testimony

At trial, Alexander testified that he told Batiste twice that he needed to sign the logbook and Batiste refused, stating, “I ain’t signing no effing thing.” Batiste was loud and belligerent, so Alexander told Batiste to step outside, which he did.[3] Alexander said the situation worsened, and Batiste was drawing attention to himself from everyone walking in. Alexander told Batiste twice to leave the property, but he refused, so Alexander told Batiste he was under arrest.
Alexander handcuffed Batiste’s left hand, and Batiste claimed he had done nothing. Alexander told Batiste again that he was under arrest and asked for his other hand, but Batiste did not comply. Alexander took Batiste’s right hand to finish cuffing him, but he jerked away. Alexander then put a hand on the back of Batiste’s neck and escorted him to the police car while asking for his right hand. Batiste repeated he had done nothing. Alexander responded that he was booking Batiste for entry or remaining after being forbidden and disturbing the peace. They arrived at the car and Batiste still would not give Alexander his other hand, so Alexander pushed him. against the car for leverage and was able to grab the other hand and finish handcuffing him. Alexander explained: “And when I was trying to get him in the car, he got stiff as a board. I said, dude, get in the car. At that point *195 we was tussling, so what I did, I pushed him in the car.”
Alexander called Sergeant Nacoste, the site supervisor, and explained what had occurred. Nacoste advised Alexander he could not book Batiste into jail because Alexander was at the mental health- center alone and could not leave it unattended. Nacoste told Alexander to issue Batiste a summons. Alexander read Batiste his IsMiranda[4] rights, issued a summons, and told Batiste he could bring the letter for his son the next day.
Alexander testified he did not strike or hit Batiste in the building, outside, or while he was in the car, and he did not curse at Batiste. Alexander testified that Batiste could have possibly hit his head when Alexander was trying to get him in the car. He did not recall telling Batiste he made $27.00 per hour. Alexander had no complaints filed against him for use of excessive force.
Batiste’s trial testimony as to what occurred differs from Alexander’s. Batiste testified that when Alexander asked him to go outside, he did so. Alexander told him, “Yo, dog, what are you doing? ... When I ask you to sign the log, you sign it.” Batiste replied, “No, first of all, my mama ain’t named me no dog. My name is Cedric Wayne Batiste.” According to Batiste, Alexander replied, “Let me tell you one thing. This is a job that don’t pay nothing anyway because I only make $27.00 an hour.” Batiste told Alexander he did not want to know how much he made and he thought he could “rule people” “just because” he wore a badge. Alexander then told Batiste to leave. Batiste refused, telling Alexander he wanted to turn in his letter. Batiste started calling on his phone because he could not go back inside. Alexander told him to put the phone down, and Batiste responded that he wanted to give Lewis the letter.
According to Batiste, Alexander told him to put the phone down again, then Alexander jerked the phone out of his hand and slammed it on the ground. Batiste testified that Alexander
[Gjrabbed me by my neck like that. And then he went with the other hand and punched me in my face. Then he grabbed my shirt like that and pulled me to his unit. And when he got me to the unit that’s when he — like he said, he shoved me against the unit. My chin hit the trunk and that’s when he put the cuffs on me. He did not read me my rights at all. He throwed [sic] me in the unit, just like he said, and when he got me in the unit he called me all kind of B’s, H’s. Everything he could | finame, he said. He said you all niggers think the white people — you all niggers think the white cops be beating you all’s ass, but the niggers do it too.
Batiste said Alexander continued to curse at him and Batiste told Alexander, “man, this is police brutality how you tore my shirt, how you punched me in my face.” Batiste testified Alexander waited forty minutes and other officers arrived at the scene. One of the officers opened the door and asked Alexander what happened, to which he responded that he had “just roughed this nigger up.” Alexander told Batiste he could go. Batiste went across the street and called 911 to report what happened. Batiste was told to call Internal Affairs, which he did, and he spoke to “T. Payne.” Payne told him to go to Internal Affairs at noon, which Batiste did, but Payne was not there. According to Batiste, pictures were taken of his torn shirt, his bruised face, and “the whelps all over my chest.” He was told to call Payne *196 back, and when he did, Payne told him they were going to let the court handle the incident.
One of the witnesses to part of the incident, Elder Ray Arnold, testified that he was doing electrical maintenance in the lobby about eight to ten feet away from Alexander. He heard Alexander ask Batiste to sign the register a “couple of times” and they began arguing. Arnold testified that Batiste was speaking in a loud voice, which grew louder, but he could not recall if Batiste cursed. Arnold stated that Alexander was not speaking loudly or cursing. According to Arnold, “they” asked Batiste to step outside and “cool off and come back in.” He testified that Batiste did not, so Alexander escorted him outside. Arnold said that Alexander did not manhandle, act aggressively toward, or use physical force against Batiste. Arnold could not see what was going on outside once they left the building, although he did testify he saw Alexander walking Batiste with handcuffs to the car.
The deposition of the second witness, Joseph Michael Doiron, was introduced into evidence. Doiron testified he was working outside the front entrance and saw Alexander and Batiste leaving the building and walking towards a police car in front |7of the building. Doiron explained he was eighty to one hundred feet away, but when asked if he had a clear view, he replied affirmatively. Doiron added that the men “didn’t raise their voices real loud but I could hear [Batiste]. He was ... raising his voice but I couldn’t understand what they were saying.”
Doiron testified that when they got to the police car, Alexander reached behind Batiste to put him in handcuffs. According to Doiron, Batiste “sort of resisted a little bit, and that’s when [Alexander] grabbed [Batiste] and held on to [Batiste] and pulled [Batiste’s] arm around to put the handcuffs on, and then [Alexander] opened the door and put [Batiste] in the car.” He added, “[Batiste] didn’t want to be handcuffed. So that’s when the policeman strong-armed him, to grab his arms and get them behind [Batiste] where [Alexander] could handcuff [Batiste].” After Alexander handcuffed Batiste, he put Batiste in the back of the police car. According to Doiron, “[Alexander] opened the door and pushed [Batiste’s] head down in to the car, to keep [Batiste] from hitting [Batiste’s] head on the roof.” Doiron testified he did not see anything else happen. He did not see Alexander ever strike Batiste and did not see any bruises on Batiste. He testified that Alexander was treating Batiste in a professional manner and was not abusing him in any way. Doi-ron did not see anything that occurred inside the facility.
DISCUSSION
Louisiana jurisprudence recognizes that factual determinations made by a trial court are entitled to great discretion on appeal. See, e.g., Smith v. Louisiana Department of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Stobart v. State, 617 So.2d 880, 882 (La.1993); Creekmore v. Elco Maintenance, 94-1571 (La.App. 1 Cir. 6/30/95), 659 So.2d 815, 817. An appellate court cannot set aside a factual finding made by a trial court absent manifest error or unless the finding was clearly wrong. Smith, 633 So.2d at 132. Where there is a conflict in testimony introduced at trial, reasonable evaluations of credibility and reasonable inferences |Rof fact should not be disturbed on review, even if the appellate court feels that its own evaluations of the testimony are more reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Where factual findings are based on determinations regarding the credibility *197 of witnesses, the manifest error — clearly wrong standard demands great deference to the trial court’s factual findings. However, the Louisiana Supreme Court has also stated:
Where documents or objective evidence so contradict the witness’s story, or the story itself is so inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. [Emphasis added.]
Id. at 844-45
Furthermore, the Louisiana Supreme Court has clarified that appellate courts need not always uphold factual determinations made by a trial court. See, Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. In Ambrose, the Supreme Court stated:
Notwithstanding the Court’s earlier guidance to reviewing courts in [Stobart ], it was not our purpose in that case to mandate that the trial court’s factual determinations cannot ever, or hardly ever, be upset. Although deference to the fact finder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts.
[[Image here]]
Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evi-dentiary support, [footnotes omitted.] Id.
Thus, an appellate court may find that a trial court’s factual finding is manifestly erroneous or clearly wrong, even if the determination is ostensibly based on witness credibility. For example, in Wilson v. Jacobs, 438 So.2d 1119, 1121 (La.App. 2 Cir.1983), writs denied, 443 So.2d 586, 587 (La.1983), the [¡¡second circuit reviewed a trial court’s denial of a worker’s compensation claim made by a plaintiff-employee who suffered injuries while cutting timber. At trial, the judge was confronted with conflicting testimony regarding which type of tree had injured the plaintiff.[5] The plaintiff had testified that the tree was a pine, but his testimony was “rambling and confusing,” likely due to head injuries and memory impairment incurred as a result of the accident. Id. The only eyewitness to the accident, however, confirmed the plaintiffs account. Id. at 1121-22.
Nonetheless, the trial judge in Wilson determined the tree that injured the plaintiff was a hardwood. Id. at 1121. He did not clarify his reasoning, but apparently preferred the testimony of one of the defendant corporation’s land managers. Id. That individual had not personally witnessed the accident, but had testified that the tree was a hardwood. He based his testimony upon an analysis of the land, which revealed that no pine trees had been removed from the tract after the date of the plaintiffs injury. Id. at 1122. Two other individuals who were called to the scene of the accident testified that they saw both pine and hardwood tree limbs on top of the claimant. Another individual testified that he saw only hardwood limbs on top of the plaintiff. Id.
On appeal, the second circuit reversed the trial judge’s finding and concluded that *198 the tree that injured the plaintiff was a pine. Id. Despite recognizing the possible testimony upon which the trial court’s factual determinations could have been based, and in spite of recognizing that a trial judge was entitled to great deference in conclusions of credibility and facts, the court reasoned that an appellate court was not required to accept “unreasoned and unreasonable findings as to either.” Id. Because the corroborated and rational testimony of an eyewitness merited more weight than the inconsistent, self-serving, and unpersuasive | intestimony of the land manager, the court determined that the trial judge’s conclusions were “not supported by substantial evidence” and, as such, were clearly wrong. Id.
Here, the comparison to Wilson is apparent. At trial, Batiste admitted that he suffered from serious mental impairments including mild retardation, schizophrenia, and bipolar disorder. He also admitted that he had failed to take his prescribed medication on the date of trial. His testimony regarding the incident was somewhat rambling and confusing. He alleged that the incident began when he went to the Capital Area Human Services building and attempted to sign his name on the entrance register. He stated that he wanted to enter the facility to deliver a letter to a social worker who worked with his son, a beneficiary of the facility’s services.
Batiste alleged that Alexander confronted him while he was signing the register and began arbitrarily harassing him. Batiste claimed that Alexander forced him to leave the building, verbally accosted him with racial slurs and degradations, destroyed his personal property, and physically attacked him, causing serious physical and emotional damage. Batiste additionally alleged that he was arrested and kept in Alexander’s patrol car for forty minutes without being apprised of his rights. He also stated that Alexander admitted the wrongdoings to other officers, who later arrived at the scene. Batiste testified that after he was released, he called 911 and talked to the police. He stated that a City Police Internal Affairs Officer interviewed him and took pictures of his personal injuries and damaged property. He testified that he did not immediately go to the hospital for financial reasons, but later visited the doctor “like every two weeks on account of the accident that happened.”
[ nHowever, Batiste’s trial testimony was unsubstantiated by any meaningful documentary or objective evidence. The pretrial order indicated that Batiste would introduce pictures taken of his injuries, medical records, and statements and records from the City Police Internal Affair’s Department. None of this evidence was produced. The purported 911 call, which would have been recorded, was not produced. The Internal Affairs Officer was not produced. The “other officers” who allegedly arrived at the scene and spoke with Batiste were not produced. Medical records were not produced. Finally, and most troubling, is the testimony that two sets of photos of Batiste’s injuries exist, yet neither set of photos were introduced into evidence to support Batiste’s version of events. The parties did stipulate in open court that, if called as a witness, Batiste’s wife would testify that, after the alleged incident, she left work to help care for her husband’s eye, took pictures of his injuries, and visited an attorney with her husband. However, his wife’s affidavit does not support the veracity of his allegations. Notably, Batiste did not contend that his wife witnessed Alexander unlawfully detain him or employ excessive force in effectuating a lawful arrest.
*199 On the other hand, Batiste’s testimony was disputed by compelling and comprehensive evidence. Alexander testified that the incident began when Batiste refused to sign the entrance register as required by facility protocol. He stated that Batiste became upset, disruptively loud, and refused to leave upon his request. Alexander testified that he escorted Batiste outside the facility and attempted to arrest him for remaining on the premises after being forbidden and for disturbing the peace, but that Batiste resisted arrest. Still, Alexander testified he did not strike or hit Batiste at any point and never used profanity. Alexander further testified that he did apprise Batiste of his Miranda rights before issuing him a misdemeanor summons.
JjjThe incident inside of the facility was independently witnessed by a maintenance worker who corroborated Alexander’s testimony. The maintenance worker, Elder Ray Arnold, was working for the State on the day in question, performing electrical maintenance work in the lobby of the Capital Area Human Services building. Arnold testified that he witnessed Alexander ask Batiste to sign the entrance log a number of times, but Batiste refused to do so, became belligerent, and then was escorted out of the building. Arnold stated that Alexander never behaved aggressively, never spoke to Batiste in a loud voice, and did not, to his recollection, curse at the plaintiff.
The arrest outside of the facility was likewise independently and personally observed by an eyewitness whose trial deposition was introduced into evidence. That eyewitness, Joseph Michael Doiron, was working to replace mortar on the Capital Area Human Services building on the day in question. Doiron testified that he was near the front door of the building and had a clear view of the incident. He stated that Alexander behaved professionally towards Batiste at all times, even though Batiste appeared to be resisting arrest. While the witness could not hear what Alexander said to Batiste, he confirmed that Alexander never struck Batiste and even attempted to protect Batiste’s head when placing him into the cruiser.
While the trial court in the instant case did not provide any written reasons for judgment, by finding the City liable for damages allegedly sustained by Batiste, the trial court necessarily found that Batiste was either subjected to an unlawful arrest or that Alexander used excessive force in effectuating a lawful arrest. Irrespective of the particulars of the trial court’s reasoning, however, the finding was clearly wrong.
An individual or municipality may be liable for damages resulting from an unlawful arrest only if the claimant establishes that he was unlawfully detained or arrested, i.e. that he was arrested without color of legal authority. Reese v. City of Baton Rouge, 93-1957 (La.App. 1 Cir. 10/7/94), 644 So.2d 674, 676. The plaintiff bears the burden of proving an arrest was made without legal authority, and there can be no liability if an arrest was effectuated pursuant to statutory authority. Id.
If an arrest is conducted pursuant to statutory authority, an individual or municipality may be liable for damages only if the arrest is effectuated with excessive force. See, Kyle v. City of New Orleans, 353 So.2d 969, 972 (La.1977). However, La.C.Cr.P. art. 220 provides that an officer “may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.”
Multiple witnesses testified that Batiste was detained only after he became bellig *200 erent, combative, and disruptive. This behavior established probable cause to arrest Batiste, since municipal ordinances in effect forbid individuals from remaining on property after being forbidden and prohibited disturbing the peace and resisting arrest. See, Code of Ordinances of the City of Baton Rouge and the Parish of East Baton Rouge § 13:63.3, 13:103, 13:108. Testimony likewise confirmed that Alexander employed professional, non-excessive force in effectuating the arrest, even when Batiste resisted such arrest.
The trial court apparently credited the uncorroborated, unsubstantiated, illogical, and self-serving testimony of the claimant over the logical and cogent testimony of the arresting officer, which was independently and comprehensively corroborated by multiple eyewitnesses. Although the holding was purportedly based on a credibility determination, the finding lacks any significant evidentiary support and was thus manifestly erroneous. Consequently, the trial court’s holding merits reversal. See, Ambrose, 639 So.2d at 221; See also, Wilson, 438 So.2d at 1122; Rosell, 549 So.2d at 844.
114DECREE
For the foregoing reasons, the judgment of the trial court is reversed. Judgment is rendered- in favor of the City of Baton Rouge and Officer Carl Alexander, dismissing, with prejudice, Cedric Batiste’s claims against the City of Baton Rouge and Officer Carl Alexander. All cost of this appeal are assessed to the appellee, Cedric Batiste.
REVERSED AND RENDERED.
KUHN, J., dissents and assigns reasons.
HIGGINBOTHAM, J., dissents for reasons assigned by J. KUHN.

. Batiste had also been going to Capital Area Human Services for himself since 1992.

. Also named as a defendant was Baton Rouge Police Department, but in their answer, defendants’pointed out that it was not a legal entity capable of being sued.

. ■ Alexander testified that, as to people visiting the center who were not mental health patients who were causing a disturbance, he was instructed to tell them to leave and come back the next day.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The type of tree that injured the plaintiff was important as it determined which of the co-defendant corporations might have been the plaintiff's statutory employer. See, Wilson, 438 So.2d at 1121.